David **KELLER**, Plaintiff–Appellant,

v.

**UNITED STATES of America,**
Defendant–Appellee.

No. 94–2633.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 28, 1995.

Decided June 29, 1995.

Aram A. Hartunian, Hartunian & Associates, Karen A. Keefer (argued), Scott Skaletsky, Skaletsky & Mannis, Chicago, IL, for plaintiff-appellant David Keller.

Linda A. Wawzenski, Asst. U.S. Atty. (argued), Thomas P. Walsh, Asst. U.S. Atty., Office of U.S. Atty., Civ. Div., Chicago, IL, for defendant-appellee U.S.

Before BAUER, COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

David Keller, who suffered a crippling disability as the result of an operation at a Veteran's Administration Hospital in New Mexico, appeals the denial of his medical malpractice claim against the United States government under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* For the following reasons, we affirm the judgment of the district court.

I

On April 1, 1988, at the Albuquerque Veterans Administration Medical Center in New Mexico, Dr. Stuart Pett[1] repaired a chronic pseudoaneurism (hereinafter "aneurism") in Mr. Keller's descending thoracic aorta. Following the surgery, Mr. Keller displayed paraparesis, which is a neurological impairment consisting of diminished sensation and muscle control. Plaintiff then brought this negligence suit, claiming that the surgeon's failure to assure adequate blood flow before excising the aneurism caused the paraparesis.

---

1. Dr. Pett is a board certified cardiothoracic surgeon and associate professor at the University of New Mexico.

Repair of an aneurism requires clamping the aorta above and below the vessel for a period of time. According to the medical testimony at trial, there are at least three medically accepted clamping methods: (1) "clamp and sew," which involves simply clamping off the aneurism and working as quickly as possible, (2) use of a passive or "Gott" shunt, which utilizes a tube to bypass the site of the operation, and (3) use of a shunt with a pump attached in order to increase the flow of blood. Spinal injury is a recognized potential side-effect of repairing aortic aneurisms because the operation requires interfering with the blood flow to the lower body, including the lower spine. According to Dr. Lawrence Michaelis,[2] the government's expert witness, there is a 3–5% chance that spinal cord injury will result from the operation regardless of the technique used. Dr. Pett chose to use the shunt in conjunction with a Biomedicus centrifugal pump, which has a variable speed setting.[3] However, the pump's output is ultimately limited both by the flow of blood available from the atrium and by the need to supply blood to the upper and lower body. Dr. Pett inserted a canula into the left atrium of Mr. Keller's heart to carry blood to the pump. The pump then would send that blood through another line to the lower descending thoracic aorta. Dr. Pett clamped the aorta above and below the aneurism. The aneurism was repaired, a graft was sewn in, and, after two intercostal arteries were sewn off, the patient was closed up. The aorta was clamped for fifty minutes, and the Biomedi-cus supplemented circulation for all but five minutes of that time.

Blood flow is measured by a device attached to the pump. It can also be indirectly measured by blood pressure, which, if the resistance created by the walls of the blood vessels remains constant, generally increases as blood flow does. However, if the resistance drops, blood pressure may also drop, even if the blood flow remains the same. During Mr. Keller's operation, various blood pressures were measured by using pressure monitoring lines in Mr. Keller's right arm, his left femoral artery, his neck and the left atrium of his heart.

The medical record contains little evidence concerning the blood flow downstream to Mr. Keller's lower spine during the operation.[4] Since the pump record documenting blood flow was not produced, the parties relied upon blood pressure readings in order to show whether the pump was generating enough blood flow to support the operation. Mr. Keller points to the consistently low blood pressure for more than half of the operation.[5] However, Dr. Michaelis, the government's expert, pointed out that the upstream pressures pumping blood to the upper body were fine. He testified that, if the pump was not drawing blood out of the left atrium, then the pressure in the upper part of the body would have remained extremely high. He also testified that the constant, rather than pulsatile, flow generated by the pump often causes the blood pressure to decrease even if the blood flow did not change.

2. Dr. Michaelis is a board certified cardiac surgeon, senior vice president for medical affairs at Northwestern Memorial Hospital, and professor of surgery at Northwestern University School of Medicine.

3. We must decide the case on the basis of the description of the surgical procedure presented by the district court and the parties. The record might possibly support a different description of the procedure, but it is not our role to scour the record independently and to characterize the procedure differently from the presentation offered by the parties. It is certainly not our task to make arguments that the parties do not make.

4. The term "downstream" refers to those parts of the body fed by the aorta below the site of the operation. "Upstream" refers to the respective parts of the upper body fed by the aorta above the site of the operation.

5. At 11:30, which was around the time that Dr. Pett applied the clamps to the aorta, the downstream blood pressure dropped to a low level of 18. At 12:05, the downstream pressure was 42. The nurse anesthetist stated that he had probably not recorded any changes in the downstream pressure during this period because it had not altered. Dr. Bass, Mr. Keller's expert, noted that according to the medical record, the pressure had reached 50 by 12:10. In addition, Mr. Keller noted that the pump needed to be adjusted at some point, and that tests revealed acidosis, a lowering of the blood's pH that may indicate poor blood flow.

After a bench trial, the district court concluded that there was no credible testimony to support a conclusion that there was any breach of the standard of care during the surgery. Before us, Mr. Keller challenges that ruling. Mr. Keller contends that, due to the surgeon's failure to monitor and to use the Biomedicus pump properly, the spinal cord was deprived of an adequate blood supply and paraparesis resulted. More specifically, Mr. Keller submits that the record demonstrates that the blood flow to the lower body was not sufficient and that Dr. Pett must have been negligent because he (1) never learned of the inadequate blood flow, (2) knew about it and cut into the aorta anyway, or (3) failed to start the pump before starting the excision. Mr. Keller asks this court to reverse the district court judgment by holding that the record does support a determination that Dr. Pett was negligent.

## II

■ Following a bench trial, we review the district court's findings concerning questions of fact under a clearly erroneous standard. *Thornton v. Brown,* 47 F.3d 194, 196 (7th Cir.1995). The substantive law of the state where the act or omission occurred governs actions brought under the Federal Tort Claims Act. 28 U.S.C. § 1346(b); *Midwest Knitting Mills Inc. v. United States,* 950 F.2d 1295, 1297 (7th Cir.1991); *see United States v. Muniz,* 374 U.S. 150, 153, 83 S.Ct. 1850, 1853, 10 L.Ed.2d 805 (1963) ("Whether a claim could be made out would depend upon whether a private individual under like circumstances would be liable under state law...."). We therefore apply, as did the district court, the substantive law of New Mexico. The district court's determination of the content of state law is reviewed *de novo. Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991); *Midwest Knitting Mills,* 950 F.2d at 1298.

■ The New Mexico Supreme Court has formulated the standard of care for physicians; it is a duty to use "the knowledge, skill and care ordinarily used by reasonably well-qualified doctors of the same field of medicine practicing under similar circumstances...." *Pharmaseal Labs., Inc. v. Goffe,* 90 N.M. 753, 757–58, 568 P.2d 589, 593–94 (1977). Medical malpractice must be shown by expert testimony on the standard of care, unless the question may be determined by the ordinary knowledge of a layman. *Id.,* 90 N.M. 753, 568 P.2d at 594. Although local differences in care are considered as a factor, one which did not play a major role in this case, doctors from other localities may testify as to the standard of care. *Id.* To establish the prima facie case for medical malpractice under the law of New Mexico,

> a plaintiff has the burden of showing that (1) the defendant owed the plaintiff a duty recognized by law; (2) the defendant breached the duty by departing from the proper standard of medical practice recognized in the community; and (3) the acts or omissions complained of proximately caused the plaintiff's injuries.

*Blauwkamp v. University of N.M. Hosp.,* 114 N.M. 228, 836 P.2d 1249, 1252 (N.M.Ct.App. 1992) (citations omitted). With these standards in mind, we now turn to the specific contentions of Mr. Keller.

## III

■ Focusing on the issue of blood flow, Mr. Keller first raises several evidentiary issues. He submits that the government's failure to produce a copy of the pump record entitles him to a negative inference as to whether the pump provided sufficient blood flow. The district court found that the records "cannot be located even though the hospital should have kept them." R. 25 at 5. Notably, the court made no finding of bad faith. Absent a finding that the government willfully destroyed evidence in bad faith, the district court clearly acted within its discretion in declining to infer that the evidence would have been unfavorable to that party.[6]

---

**6.** *See BASF Corp. v. Old World Trading Co.,* 41 F.3d 1081, 1098 (7th Cir.1994) (noting that the court was "particularly reluctant" to find that the district court erred by not drawing an infer-

ence from missing documents because the district court had made no finding that the documents had been willfully destroyed); *United States v. Esposito,* 771 F.2d 283, 286 (7th Cir.

We note from the record that there is evidence the university did not keep the pump records, and that there is no evidence that the records were actually destroyed.[7] We therefore conclude that the record adequately supports the determination of the district court.

Mr. Keller also claims, in conclusory fashion with no citation or discussion of federal authority, that Dr. Pett made judicial admissions that bind the United States in this litigation.[8] We need not explore this matter in any depth for two reasons. First, as we have noted many times, it is not the

1985) (noting that a finding of bad faith is necessary to an invocation of the spoliation doctrine), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1187, 89 L.Ed.2d 302 (1986); *S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R.,* 695 F.2d 253, 258–59 (7th Cir.1983) (same). *See also United States v. $94,000.00 in U.S. Currency,* 2 F.3d 778, 787 (7th Cir.1993) (holding, in civil forfeiture case in which government failed to produce document, that district court did not abuse its discretion by refusing to grant sanctions because *inter alia* no contention of bad faith); *Coates v. Johnson & Johnson,* 756 F.2d 524, 551 (7th Cir.1985) (declining to make inference where documents were destroyed under routine procedures, not in bad faith).

In his reply brief, Mr. Keller, relying on *Nation–Wide Check Corp. v. Forest Hills Distribs., Inc.,* 692 F.2d 214, 218 (1st Cir.1982), claims that the government had an obligation to establish that the documents had been destroyed. Because it did not carry that burden, he contends, he need show only that the government "had notice that the documents were relevant at the time [it] failed to produce them." We cannot accept this argument. *Nation–Wide Check* cannot be read in a principled way as standing for the proposition that, although bad faith is necessary if the documents have been destroyed, a lesser standard is appropriate when the documents are simply missing. Indeed, the First Circuit made a point of noting that the documents at issue in that case had been abandoned in a manner that was "purposeful" and "in knowing disregard" of the claim before the court. *Id.* at 217.

Mr. Keller's assertion concerning the government's failure to produce records makes no effort to rely on New Mexico authority. We note that there are some diversity cases indicating that state law ought to apply. *See, e.g., Allstate Ins. Co. v. Sunbeam Corp.,* 53 F.3d 804, 805 (7th Cir.1995) (products liability action) (noting that the parties agreed that the duty to preserve evidence was governed by state law); *Unigard Security Ins. Co. v. Lakewood Eng'g & Mfg. Corp.,* 982 F.2d 363, 367 (9th Cir.1992) (strict liability/negligence case) (stating that the spoliation counterclaim, brought in diversity, is controlled by state law, but holding that there was no valid spoliation claim). There is some authority that cases under the Federal Tort Claims Act also should use state law. *See Welsh v. United States,* 844 F.2d 1239 (6th Cir.1988) (following state law to consider government's failure to produce evidence within its control; holding that a rebuttable presumption of causation under Kentucky law was proper).

Other cases are less definitive. Another panel of the Ninth Circuit considered the destruction of evidence in a diversity/products liability case to be a straightforward evidentiary ruling which must be reviewed under the abuse of discretion standard. *Glover v. BIC,* 6 F.3d 1318, 1329 (9th Cir.1993) ("A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence. Such power includes the power where appropriate to order the exclusion of certain evidence."). *See also Eaton Corp. v. Appliance Valves Corp.,* 790 F.2d 874, 878 (Fed.Cir.1986) (reviewing a diversity suit concerning trade secret misappropriations, following the Seventh Circuit's spoliation law, as stated in *S.C. Johnson & Son v. Louisville & Nashville R.R.,* 695 F.2d 253 (7th Cir.1982)); *S.C. Johnson & Son,* 695 F.2d at 258–59 (stating that a court may infer that the evidence would be unfavorable to the destroying party only if the court opines that the evidence was destroyed in bad faith).

The Court of Appeals of New Mexico, in *Bush v. Thomas,* 119 N.M. 54, 888 P.2d 936 (N.M.Ct. App.1994), has stated that "New Mexico has not recognized either negligent or intentional spoliation of evidence as a tort." *Id.,* 119 N.M. 54, 888 P.2d at 939.

7. Dr. Pett testified that he could not say whether the record was kept or not and that he and others had looked diligently for a copy. He also said that neither he, nor the perfusionists that he asked, could recall who acted as perfusionist for the operation. In a letter from defense counsel to Mr. Keller's attorney, which Mr. Keller's attorney read into the record, defense counsel said that the medical center had no perfusionists on staff, but hired them from the University of New Mexico Medical School. Someone at the university told defense counsel that it was common practice not to retain the pump records from surgeries other than heart transplants and that the university also followed this practice.

8. Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are "not evidence at all but rather have the effect of withdrawing a fact from contention." Michael H. Graham, *Federal Practice and Procedure: Evidence* § 6726 (Interim Edition); *see also* John William Strong, *McCormick on Evidence* § 254, at 142 (1992). A judicial admission is conclusive, unless the court allows it to be withdrawn; ordinary evidentiary

responsibility of this court to make arguments for the litigants. *See Beard v. Whitley County REMC,* 840 F.2d 405, 408–09 (7th Cir.1988). In any event, the "admissions" at issue here are not admissions at all. In arguing that the district court erred, Mr. Keller specifically alleges that Dr. Pett admitted (1) that a pressure of 50 is necessary, (2) that, in order to discover if the pump was functioning in time to halt the operation, the physician must check the pump before cutting into the aorta, and (3) that the safety point for interrupting blood flow is 30 minutes, and even an interruption of 20 minutes can be hazardous. Our review of the record indicates that Dr. Pett's statements were misstated or misconstrued. First, the surgeon indicated that a pressure of 50 was a goal, not an absolute requirement. Second, on cross-examination, Dr. Pett agreed that he could check the pump's function before excising the aneurism, but he did not "admit" that he had to check it. And third, Dr. Pett's statements concerning the time limits for safely operating without a pump were part of a general discussion to show that operating with a broken pump is not equivalent to operating without a pump at all.

## IV

■ We now consider Mr. Keller's reasons for asserting that the district court erred in determining that there was no negligence. At this point, it bears repeating that Mr. Keller has the burden of proof. We also must emphasize that the district court was entitled to, and did, make credibility determinations.[9] Although Mr. Keller raises a number of potential factual discrepancies or alternative interpretations of the evidence, in order to prevail, he must establish that the decision of the district court cannot be supported by the evidence. *See, e.g., Trzcinski*

*v. American Cas. Co.,* 953 F.2d 307, 315 (7th Cir.1992) (stating that district court verdict will not be set aside if a reasonable basis exists in the record to support it); *M.T. Bonk Co. v. Milton Bradley Co.,* 945 F.2d 1404, 1407 (7th Cir.1991) (same); *see also Boggan v. Data Systems Network Corp.,* 969 F.2d 149, 150 (5th Cir.1992) (reversing because there was no evidence to support plaintiff's claim of fraudulent inducement).

■ The thrust of Mr. Keller's argument is that Dr. Pett negligently cut into the aorta even though the blood flow was insufficient. He first claims that the pump was malfunctioning. The district court implicitly found, however, that the pump was working when it found that the low blood pressure resulted from the constant flow of the pump during Mr. Keller's surgery. This finding of fact is not clearly erroneous. Dr. Michaelis testified that, in procedures using the pump, he had seen precipitous drops hundreds of times due to lowered resistance. He also testified that the normal level of the upstream pressure indicated that the pump was drawing blood out of the atrium. We cannot say, therefore, that the evidence does not support a determination that the pump was working.

■ Mr. Keller also claims that the pump may not have been turned on until after the aorta was opened. The district court found that the pump was turned on after cross-clamping and that there was no evidence that the surgeon had violated the standard of care. The record contains no direct evidence to indicate that Dr. Pett did not check the pump before cutting into the aorta. Nor does the record contain circumstantial evidence that compels the conclusion that the pump was not on. We cannot say that we are left with the definite and firm conviction that a mistake has been made.

■ Finally, Mr. Keller also contends that the surgeon breached the standard of

admissions, in contrast, may be controverted or explained by the party. *Id.* When a party testifying at trial or during a deposition admits a fact which is adverse to his claim or defense, it is generally preferable to treat that testimony as solely an evidentiary admission. Michael H. Graham, *Federal Practice and Procedure* § 6726, at 536–37.

9. The district court specifically determined that Dr. Michaelis, the government's expert, had superior qualifications to Mr. Keller's expert, and that Dr. Michaelis rendered a credible opinion which was better supported by the evidence of record.

care by proceeding with the surgery despite the low blood pressure. Dr. Michaelis disagreed. Describing the preparatory steps of the operation in detail and the trauma to the body in surgery, he testified that, even at the point of clamping, it would take a very serious development, like a massive heart attack, to require the surgeon to terminate the procedure. The district court, after lengthy examination of the expert witnesses, credited the testimony of Dr. Michaelis on this issue. Our review of the testimony at trial makes clear that the district court's credibility determination, and its conclusion that there was no evidence of a breach in the standard of care, did not constitute clear error.

We must conclude, therefore, that the district court's determination that the attending surgeon did not breach the standard of care is sufficiently supported by the evidence. Accordingly, we cannot disturb its judgment.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.