Hazel CHARET, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 95 C 1379.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 27, 1996.

James E. Kaese, III, Susan E. Loggans & Associates, Chicago, IL, Susan Elizabeth Loggans, Michael Bryant Stillman, Loggans, Condron & Cox, Chicago, IL, for plaintiff.

Cathleen Rene Martwick, United States Attorney's Office, Chicago, IL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOLDERMAN, District Judge:

The evidence adduced at the one-day bench trial conducted in this case on February 20, 1996 revealed the following:

### FACTS

At approximately 11:00 a.m. on February 1, 1994, plaintiff Hazel Charet, age 81, slipped and fell as she walked on the sidewalk approaching the entrance doors to the U.S. Post Office in Niles, Illinois. As she fell she extended her left arm, with her hand palm down, to try to brace her fall. She then landed on the left side of her body after cushioning her fall with her hand and arm. After her fall, Mrs. Charet got up with the help of a passer-by and entered the Niles Post Office building. Once inside the Post Office building she told, Viola Wilson, the assistant supervisor at the Niles Post Office what had happened. Ms. Wilson then took Mrs. Charet into an office in the Post Office and gave Mrs. Charet a dampened paper towel to put on her wrist which Mrs. Charet said she had hurt in the fall.

Mrs. Charet sat in the office for about half an hour and spoke with postal personnel while she recovered from the jolt of the fall. Mrs. Charet, accompanied by Ms. Wilson, then walked back to Mrs. Charet's car which was parked in the Post Office parking lot near the front of the Post Office building. Mrs. Charet, who is right-handed, then drove herself to Lutheran General Hospital in nearby Park Ridge, Illinois using her right hand to steer the car and draping her left arm over the car's steering wheel.

At the hospital Mrs. Charet was diagnosed by an emergency room physician, Brian Pine, M.D., as having a fractured left wrist. While at Lutheran General Hospital, on February 1, 1994, Mrs. Charet's left wrist was placed in a plaster cast. She then was taken home to recuperate by her adult daughter and son-in-law who had come to the hospital after being notified of Mrs. Charet's fall.

Three days later on February 4, 1994 Ms. Charet consulted Melvin P. Katz, M.D. Dr. Katz's letter to Dr. Pine dated February 4, 1994 states of Mrs. Charet in part:

This 81 year old woman is being seen in consultation secondary to a fall on the ice on 2/1/94. As she fell, she landed on the outstretched left upper extremity. Had immediate pain and tenderness in the left wrist. No other complaints. No history of loss of consciousness. Patient was found to have a severely comminuted, displaced, interarticular fracture of the distal left radius. Was placed in a long-arm cast and comes in today with her daughter. Is feeling better. Still moderate amount of pain at the fracture site. No previous history of injury to this wrist.

On February 11, 1994, ten days after her fall, Mrs. Charet told her physician according to her physician's notes:

"She feels much better. Has been working on range of motion exercises to the finger and shoulder on the left. Having less pain at the fracture site. Having less pain at the fracture site." (Government Exhibit 2, pg. 46)

On March 1, 1994, one month after her fall, the examining physician's notes state about Mrs. Charet:

"Is here with her daughter in law. Is feeling well. Has been working on elevation and range of motion exercises. No complaints." (Government Exhibit 2, pg. 46)

On March 16, 1994, six weeks and one day after her fall, the cast was removed from Mrs. Charet's left wrist and her attending physician noted she had: "Full range of motion of the fingers and thumb and shoulder." (Government Exhibit 2, pg. 46)

On March 22, 1994, seven weeks after her fall, Mrs. Charet started a program of physical therapy and told the physical therapist: "It's getting a lot better." (Government Exhibit 2, pg. 30, 32)

On March 30, 1994, Mrs. Charet told her physical therapist: "I think I'm doing better." (Government Exhibit 2, pg. 33)

The notes of Mrs. Charet's doctor of her visit of April 12, 1994 state in part:

Patient's now approximately 10 weeks post fracture. Has been working on physical therapy, mobilizing her hand and wrist on the left. (Government Exhibit 2, pg. 50)

On April 25, 1994, Mrs. Charet told her physical therapist "I'm doing everything now." (Government Exhibit 2, pg. 34)

On April 26, 1994 Mrs. Charet told her physical therapist: "I wasn't sure if I needed to come back." (Government Exhibit 2, pg. 31) There were no further notes by the physical therapist of visits by Mrs. Charet after that which were offered in evidence.

On July 12, 1994, Mrs. Charet had an appointment scheduled to see her doctor about her previously broken left wrist. She did not go to that appointment. (Government Exhibit 2, pg. 50)

On July 17, 1994, after being sent a letter by her doctor about her missed appointment, Mrs. Charet attended a rescheduled appointment. Her doctor's notes state:

Patient is feeling fine, no complaints. Is using the left arm in a regular fashion. (Governments Exhibit 2, pg. 50)

On August 16, 1994, Mrs. Charet saw her doctor for an unrelated ailment and expressed no complaints of pain or discomfort

in her left wrist. (Government Exhibit 2, pg. 49)

A year later, on August 23, 1995, after having not seen her doctor in over a year, Mrs. Charet again went for a check-up of her wrist. Her doctor's notes of that visit state in full:

> This 82–year old woman is here for "a final check-up" on her left wrist fracture. She states her daughter thought it "would be necessary." Is settling her lawsuit shortly. She fell in front of a post office. Patient states she is able to use her left hand for her regular activities. Notices no difficulty. Is concerned about the likelihood of re-injury. No other complaints.
>
> PHYSICAL EXAMINATION: Full active range of motion of the left shoulder, elbow and wrist on the left. Full pronation and supination. Severe osteoarthritic changes on the fingers of both hands. No sensory deficit or motor deficit of the fingers including function of the ulnar and median nerve.
>
> X–RAYS GM: AP, lateral, and oblique of the left wrist show additional healing has taken place of the fracture of the distal left radius.
>
> RECOMMENDATIONS: Continue regular activities. Avoid trauma. Follow up p.r.n. Told the likelihood of this refracturing without severe trauma would be unusual. (Government Exhibit 2, pg. 49)

Mrs. Charet testified that after her fall her left wrist and arm were "very painful ... very excruciating pain." She also testified that she has had continuing pain in her left wrist and that her wrist has "healed badly." The ease with which Mrs. Charet used her left hand and bent her left wrist backward to demonstrate while on the witness stand how she was injured seem to belie any continuing pain from her injury. This, as well as the court's observations of her use of her left hand and wrist while Mrs. Charet was at counsel table during the trial, has made the court believe that her claims of continuing pain are exaggerated. The court's observations plus the inconsistency between Mrs. Charet's testimony and the above-quoted reports affect this court's assessment of the credibility of Mrs. Charet's testimony.

As to how she fell when she was approaching the Niles Post Office on February 1, 1994, Mrs. Charet testified at the trial on direct examination as follows:

Q As you approached the entrance way, could you describe what happened?

A Well, I walked slower than usual, but I got there okay, and then just as I was about to enter, and extended my hand to open the door, down I went. I started to slip. And this was kind of funny because everything—you know, all the way over I managed to get there without incident. But there was a—seemed to be a slippery—bigger slippery patch there near the—that part than the other place. Well, anyway, I felt like I was losing control, and I tried to grab the door, I tried to grab something. I ended up with just landing on my hand in this position. And when I was on the ground I noticed that there was a rift between the two, the sidewalk and the lot, and at the time, I didn't think about that or anything else, but I do remember seeing that—

Q Okay.

A —and with the ice formed.

During the time Mrs. Charet was testifying at the trial that: "I ended up with just landing on my hand in this position," she was gesturing with her left hand by extending her fingers, placing her left palm faced down and bending her left wrist backward. She recreated this position to display how her left wrist became fractured and she did so without prompting or hesitancy and with no visible indication of pain. No lawyer sought to make a record of her gestures. This court observed, however, those gestures and also the way plaintiff used her left hand and wrist in the courtroom during the trial. She displayed no signs of pain or discomfort while using her left hand to brace herself as she took her seat at counsel table after testifying, or at other times during the trial.

The "rift between ... the sidewalk and the [parking] lot" to which plaintiff referred in her direct examination was located, according to later testimony, about eight feet from the entrance door of the Post Office. Mrs. Charet testified that she "was about to enter, and

extended my hand to open the door" when she slipped. Plaintiff testified further "all of a sudden there was a bump" that the toe of her left foot hit. After the fall, as she lay on the ground and struggled to get up, Mrs. Charet "noticed this big separation there was built up with ice and had like a mound above it, you know." Although plaintiff testified that the rift or separation between the Post Office sidewalk and parking lot was "very noticeable," plaintiff offered no credible evidence as to how the ice had "built up" or whether the mound was a natural or unnatural accumulation.

In the early morning hours of February 1, 1994 there had been a snow and ice storm. Conditions were icy in the area. Light snow, sleet and rain continued to fall that morning until the weather cleared after Mrs. Charet had fallen. At about 8:30 a.m. on February 1, 1994 John Pesick, the building custodian at the Niles Post Office, cleared the walkways of the accumulated snow and ice that had fallen that morning and the night before. He then put salt on the ice that remained on the sidewalk. The Niles Post Office opened for business as usual at 9:00 a.m. Mrs. Charet fell at approximately 11:00 a.m. No other person fell or complained to postal personnel about icy conditions on the Post Office sidewalk that day. After Mr. Pesick was told that someone had fallen on the sidewalk leading to the entrance of the Post Office, he again salted the ice that had formed on the sidewalk.

### CONCLUSIONS OF LAW

■ Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), this court is to apply Illinois law. *Keller v. United States,* 58 F.3d 1194, 1197 (7th Cir.1995).

■ Illinois follows the "natural accumulation" rule when addressing issues such as those raised by the case at bar. Under Illinois law, a property owner or landlord has no duty to remove a natural accumulation of snow or ice from a premises.[1] *Watson v. J.C. Penney Co.,* 237 Ill.App.3d 976, 978, 178 Ill.Dec. 929, 930–31 605 N.E.2d 723, 724–25

(4th Dist.1992). As the esteemed Illinois jurist Justice Robert Steigman concisely explained in *Watson:*

> "Even when a person voluntarily removes snow, he does not owe a duty to remove natural accumulations of ice underneath the snow; the plaintiff must show that defendant created the unnatural accumulation of exposed ice ... In Illinois, this rule dates back to 1931, and Illinois courts of review have consistently reaffirmed it." *Id.* (Citations omitted)

*See also, Stiles v. Panorama Lanes, Inc.,* 107 Ill.App.3d 896, 898, 63 Ill.Dec. 503, 505, 438 N.E.2d 241, 243 (5th Dist.1982). (Ruts and ridges caused by vehicular traffic in the snow and ice which had accumulated in parking lot not an unnatural accumulation.)

■ In this case, plaintiff had the burden of proving by a preponderance of the evidence that an unnatural accumulation or an aggravation of a natural condition of the snow or ice that fell at the Niles Post Office on the morning of February 1, 1994 caused plaintiff's injury. *See Wells v. Great Atlantic & Pacific Tea Co.,* 171 Ill.App.3d 1012, 1015–16, 121 Ill.Dec. 820, 822–24, 525 N.E.2d 1127, 1129–31 (1st Dist.1988). (Authored by Justice [now United States District Judge] Blanche Manning).

■ Plaintiff failed to sustain her burden of proof. The proof did not establish any negligent conduct on the part of building custodian John Pesick or any other personnel of the U.S. Post Office on February 1, 1994 or at any other time.

There was no proof that the icy condition of the sidewalk or the mound of ice about which plaintiff testified resulted from any unnatural accumulation of snow or ice or the aggravation of a natural condition by any Post Office personnel. Indeed, the evidence established that the icy condition of the sidewalk was, more likely than not, caused by the falling light snow, sleet and rain the morning of February 1, 1994.

---

1. As was noted during the trial, section PM–301.5 of the Village of Niles BOCA Basic Property Maintenance Code offered by the plaintiff and admitted in evidence (Plaintiff's Exhibit 3) established no further duty on the part of the Post Office beyond that established by Illinois law.

Because the plaintiff has failed to prove her claim of negligence, the court need not address any issue as to contributory negligence by the plaintiff, such as what boots plaintiff was wearing that morning, or any issue as to her claim for recovery of damages.

## CONCLUSION

For the reasons stated above, the court finds for the defendant and against the plaintiff on the issue of liability. Judgment is entered for the defendant and against the plaintiff. All pending motions are moot. This case is dismissed in its entirety. Each side to bear its own costs and fees.