In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3340

ROBERT E. DONAIS,

Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 96 C 3948--James T. Moody, Judge.

Argued April 13, 2000--Decided November 13, 2000

Before HARLINGTON WOOD, JR., ROVNER, and
DIANE P. WOOD, Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge.  In
June 1996, Robert E. Donais sued the
United States pursuant to the Federal
Tort Claims Act, 28 U.S.C. sec.sec. 2671-
2680, alleging that a third-year resident
at the Edward Hines Veterans
Administration Hospital (the "VA") in
Hines, Illinois, committed medical
malpractice in treating Donais for
cataracts by negligently fitting and
implanting an intra-ocular lens in
Donais's right eye, causing the eyesight
to deteriorate and requiring further
surgery to correct the problem. Following
a bench trial, the district court entered
judgment for the United States. Donais
appeals.

I.  BACKGROUND

  Donais was an accountant who specialized
in tax preparation. Donais, who had never
worn glasses, began to experience
difficulties with his vision in late
1991/early 1992. He first went to a
private ophthalmologist, where he was
diagnosed with cataracts. Surgery was

discussed. Donais contacted the local VA hospital, where, as a veteran, he would be covered for cataract surgery. In June 1992, Donais sought an eye examination and evaluation at the VA eye clinic. At that time, where a refraction of 0 diopters is equivalent to 20/20 vision, Donais's right eye had a myopic refraction of -6.0 diopters and his left eye had a myopic refraction of -4.0 diopters. Although he had cataracts in both eyes, he was told that he needed surgery on his right eye but not on the left. He was referred to Dr. George Yanik, a third-year ophthalmology resident, for cataract surgery.

The surgery would replace Donais's natural lens with an artificial lens placed in the capsular bag. Yanik's target was to give Donais a myopic refraction level of -4.5 to -4.6 diopters./1 Refraction of -4.6 was a spherical equivalent measurement, which reflects a combination of the eye's myopic refraction and the degree of astigmatism (misshaping of the cornea) occurring. Astigmatism can often occur as a consequence of cataract surgery. Yanik chose this refraction level so Donais's right eye would be balanced with his left. Generally, when the two eyes are not balanced, the imbalance may cause a condition called "anisometropia," which makes vision difficult. Yanik also chose the -4.5 to -4.6 target because Donais indicated that he did not want to wear reading glasses, and with this myopic refraction reading glasses would be unnecessary.

In order to determine the appropriate power of the implanted lens, two measurements were used. The first was a K reading, which measures the curvature of the cornea. The second was an ultrasound probe known as an A-scan, which measures the axial length of the eye from the front of the cornea to the back of the retina. These two measurements are then used in a computer analysis which calculates the correct lens power. Yanik's procedure was to take five or more separate A-scan measurements. If all of the measurements were within two-tenths of a millimeter, Yanik would use the resulting average as the patient's axial length. The only other figure needed is known as the "A constant" of the artificial lens, which is provided by

the lens manufacturer. Using an established and accepted calculation known as the SRK formula, Yanik determined that he would need a 29 diopter lens to achieve his target of -4.5 to -4.6 diopters.

In July 1992, Yanik performed the surgery without any complications. Soon after, however, it was discovered that the right eye was providing a greater degree of myopic refraction than the intended -4.6 diopters. Such a difference is referred to as a "power overshoot." Six weeks after the surgery, the post-operative spherical equivalent was -6.63 diopters. Between August and December 1992, the power overshoot in Donais's right eye was measured six more times, and remained in the -6 diopter range. In December, Donais was informed that he needed surgery for the cataracts in his left eye. Due to the work demands of the tax season, Donais did not return to the VA clinic until May 1993. At that time, a trial framing (which uses a series of loose lenses until the patient arrives at the most accurate correction for him) was done to determine the refraction as opposed to an automated machine refraction which had been used for the first seven readings. The refraction in the right eye was -9.5 (myopic reading) +2.75 (astigmatism), or a spherical equivalent of -8.12 diopters, as compared to the December reading of -7.25 +1.0.

Donais continued to have problems but waited until November 1993, after he turned 65 and was eligible for Medicare coverage, to schedule an appointment with Dr. Manus Kraff, a private ophthalmologist who is a well-known expert in the treatment of cataracts and co-creator of the SRK formula used by Yanik. Kraff proposed a two-step surgical procedure. First, he would perform cataract surgery on the left eye to make the refraction 0 diopters (20/20). After Donais's recovery, Kraff would then exchange the too powerful 29 diopter lens in Donais's right eye with a 23 diopter lens to make the right eye 0 diopters as well. Kraff performed the operations in December 1993 and March 1994, respectively.

Several months after Kraff's second surgery, Donais began to experience blurred vision in his right eye due

toincreased astigmatism. Kraff testified that the increased astigmatism resulted from the multiple surgeries and the compromised ability to heal. Donais has had no problems with his left eye. However, because of the resulting differences between the two eyes, Donais cannot tolerate a prescription for the right eye. Kraff recommended additional procedures for the right eye to reduce the astigmatism, but Donais declined to undergo further surgery. During the trial, Donais testified that he continues to suffer from blurry vision, but is able to read, drive, and watch television for approximately one to two hours at a time.

At trial, Kraff provided expert testimony on Donais's behalf. Kraff testified that before the original surgery, Yanik most likely mismeasured Donais's right eye, and that was the reason Yanik chose a too powerful lens. However, Kraff also testified that a power overshoot is not always a breach of the standard of care, and that he himself has overshot the lens power. Kraff theorized that the measurements taken by the VA between August and December 1992 were wrong, and therefore the actual overshoot after the surgery was higher than indicated.

Dr. Randy Epstein, expert witness for the United States, stated that Yanik did not breach any standard of care when he chose to balance Donais's right eye with his left eye, even though Epstein himself would probably not have chosen that particular refraction. Epstein testified that power overshoots are common, and, in 1992, the means of measuring the eye were not always precise and that mismeasurement causing a power overshoot would not necessarily be a breach of care. According to Epstein, the "spike" in the overshoot could not be caused by the improper lens power since the lens power remained constant.

The district court found that Donais failed to provide expert testimony that proved Yanik breached an applicable standard of care, and failed to show that any breach by Yanik proximately caused Donais's injury.

II.  ANALYSIS

Following a bench trial, we apply a clearly erroneous standard when reviewing the district court's findings of fact. Keller v. United States, 58 F.3d 1194, 1197 (7th Cir. 1995) (citation omitted). The Federal Tort Claims Act provides a remedy for personal injury caused by the negligent or wrongful act of any government employee acting within the scope of his employment, "under circumstances where the United States, if a private person, would be liable to the claimant for the act in accordance with the law of the place" where the act occurred. 28 U.S.C. sec. 1346(b); see also Midwest Knitting Mills, Inc. v. United States, 950 F.2d 1295, 1297 (7th Cir. 1991). Therefore, we apply the law of Illinois in this action.

Under Illinois law, in a medical malpractice action, the burden is on the plaintiff to prove (1) the proper standard of care by which a physician's conduct may be measured, (2) a negligent failure to comply with the applicable standard, and (3) a resulting injury proximately caused by the physician's lack of skill or care. Purtill v. Hess, 489 N.E.2d 867, 872 (Ill. 1986) (citations omitted). "Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard." Id. (citations omitted); see also Walski v. Tiesenga, 381 N.E.2d 279, 282 (Ill. 1978). To establish that a doctor is guilty of malpractice, the plaintiff must "introduce evidence of the standard of care to which the defendants were bound to adhere." Walski, 381 N.E.2d at 283-84. The only issue in the present case is whether Yanik committed medical malpractice. Therefore, Donais must first establish an accepted standard of care.

Kraff did not state a definitive baseline standard of care. Kraff disagreed with Yanik's plan of treatment, maintaining that "the wrong power of lens was implanted in Mr. Donais's eye," and that a target of -4.6 diopters with an end result of -9 diopters was a breach of the standard of care. Kraff believed that Yanik should have targeted the right eye for a 0 diopter correction, because the

cataract in the left eye would necessitate surgery and that surgery would correct the left eye to 0 diopter, leaving both eyes balanced. Kraff was unable to determine a specific amount of overshoot which would constitute a breach of care. In his deposition, Kraff stated that an overshoot of 3 diopters would not be a breach but that 5 diopters would. However, he also stated that after surgery where the target was -4.0 to -4.6, a reading of -7 "is an error, but that would be hard to say breach." Kraff also testified that a power overshoot is not necessarily a breach of care, and that he himself had on several occasions missed the target refraction and has had to replant a different lens.

Kraff acknowledged that the seven measurements taken in the first six months after Yanik's surgery were all less than a 3 diopter overshoot, which he would not ordinarily consider a breach of care. However, Kraff's explanation for the "spike" between December 1992 and May 1993 was that it was nonexistent, that it only appeared because the VA measurements through December 1992 were inaccurate, due to the use of automated refraction, as opposed to the more accurate method of trial framing, which finally revealed the "accurate" refraction in May 1993. Kraff stated that this was his assumption given the fact that the component measurements (such as the axial length and the corneal curvature) used to arrive at the automated refraction had not been kept in the VA's records; only the final refractive correction number was recorded. However, there was no evidence presented to support this assumption. Absent a finding that the government willfully destroyed evidence in bad faith, the district court does not abuse its discretion in declining to infer that the evidence would have been unfavorable to that party. Keller, 58 F.3d at 1197. Therefore, the district court did not err in declining to accept this portion of Kraff's theory.

Epstein also could not state a definitive standard of care which would clearly indicate malpractice. According to Epstein's deposition testimony, although he personally might have chosen a different diopter target, Yanik was not necessarily wrong in planning a -4.6 diopter target for the right eye to

balance with the left eye. Therefore, when Donais's right eye was measured at -8.12 spherical (-9.25 +2.75) in May 1993 at the VA clinic, the resulting 3.6 overshoot would not be considered a breach of care. Epstein testified, "I don't think that there is any degree of myopia that would have made Dr. Yanik guilty of breaching the standard of care. [A power overshoot is] just one of those things that happens with cataract surgery." He stated, "I would say one of the recognized risks of cataract surgery with lens implantation is that a patient may wind up with a lens implant that is the wrong power."

At trial, while Epstein testified that up until December 1992, the overshoot was caused by mismeasurements, he noted that the additional "spike" in refraction that was first recorded in May 1993 could likely have been a result of the lens repositioning itself due to scarring and the natural healing process and that "[i]t happens not infrequently." There was evidence in the record to support the fact that the lens had moved into the sulcus. When Donais was examined in August 1993, a VA doctor recorded that the lens was "well fixated in the ciliary sulcus," yet Yanik stated that he had inserted the lens into the capsular bag. When Kraff examined Donais, he recorded that the lens was well-placed but could not recall if it was in the bag or the sulcus. According to Epstein, if the lens did in fact move forward causing the "spike" six months after surgery, then the overshoot following the first five months of surgery averaged below 3 diopters (spherical equivalent below 2), which would not be considered outside an acceptable standard of care. He also testified that an overshoot of up to 12 diopters would not necessarily be malpractice, and was unable to draw the line as to where an overshoot would be considered a breach of care.

When only conflicting opinions as to what they consider the correct technique should have been are presented by testifying physicians, the Illinois Supreme Court has held that "the plaintiff has failed to present sufficient evidence of a standard of care in the medical community to submit the case to the jury." Walski, 381 N.E.2d at 284 (listing cases). The plaintiff does

not establish a prima facie case merely by presenting the testimony of another physician who states that he would have acted differently from the defendant. Id. at 285. Because of the uncertainty of both expert witnesses in determining the applicable standard of care, Donais failed to establish a prima facie case. In addition, the moving party must establish that a judgment cannot be supported by the evidence in order to set aside the district court's holding. See Keller, 58 F.3d at 1199 (citations omitted). Although Donais raises alternative interpretations of the evidence, these assertions alone are not sufficient to show that the district court's decision could not be supported by the evidence. The district court carefully and fully considered all aspects of this technical case and did not clearly err in finding for the defendant based upon Donais's failure to meet his burden of proof.

III.  CONCLUSION

   For the above-stated reasons, the judgment of the district court is affirmed.

AFFIRMED.

/1 Yanik testified at trial to these numbers. In his deposition, he had stated the targeted refraction was -4.0 to -4.5 diopters. However, throughout his trial testimony, Yanik most often referred to the -4.6 number.