# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LCT CAPITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. N15C-08-109 MAA CCLD |
| | ) | |
| v. | ) | |
| | ) | |
| NGL ENERGY PARTNERS LP and | ) | |
| NGL ENERGY HOLDINGS LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Submitted:  December 21, 2022
Decided:  December 22, 2022

*Upon Plaintiff's Motion to Exclude Opinions and Testimony of Defendants' Rebuttal Expert, Lori A. Lancaster:*
**DENIED.**

*Upon Defendants' Daubert Motion to Exclude the Opinions of Kevin D. McQuilkin:*
**GRANTED, in part.**

*Upon Plaintiff's Motion in Limine to Hold NGL to Judicial Admissions and Exclude Evidence Suggesting the Value of LCT's Services Was Less Than $29 Million:*
**DENIED.**

*Upon Plaintiff's Motion in Limine to Exclude Evidence of a "Typical" Investment Banker Fee as Irrelevant to Quantum Meruit Damages:*
**DENIED.**

*Upon Defendants' Motion in Limine to Preclude Evidence or Argument Regarding Any Alleged Agreement Between the Parties:*
**GRANTED.**

*Upon Defendants' Motion in Limine to Preclude Evidence or Argument Regarding Alleged Fraud and-or Fraudulent Statements:*
**GRANTED.**

*Upon Defendants' Motion in Limine to Preclude Evidence or Argument Regarding Value Creation:*
**GRANTED.**

## MEMORANDUM OPINION

John L. Reed, Esquire (Argued) and Daniel P. Klusman, Esquire, of DLA PIPER LLP, Wilmington, DE, Attorneys for Plaintiff.

Steven T. Margolin, Esquire (Argued) and Samuel L. Moultrie, Esquire, of GREENBERG TRAURIG, LLP, Wilmington, DE, and Hal S. Shaftel, Esquire (Argued) and Daniel Friedman of GREENBERG TRAURIG, LLP, New York, NY, Attorneys for Defendants.

**Adams, J.**

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

Before the Court are Plaintiff's *Daubert* motion to exclude the opinions of Defendants' rebuttal expert, Lori Lancaster ("Lancaster"), and Defendants' *Daubert* motion to exclude the opinions of Plaintiff's affirmative expert, Kevin D. McQuilkin ("McQuilkin"). The parties have also collectively filed five motions *in limine* to exclude or admit various evidence, testimony, and argument at trial. The Court heard oral argument on the motions on November 9th and 15th, 2022. The Court reserved decision on the motions except for a portion of Defendants' *Daubert* motion.[1] The Court assumes familiarity with the procedural history and facts of the case and recites them only as necessary to conduct its analysis.[2]

**ANALYSIS**

The admissibility of expert testimony is governed by Delaware Rule of Evidence 702. Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[1] *See infra* n. 36.

[2] The Court received and reviewed two letters from Plaintiff's counsel dated December 16, 2022 and December 20, 2022, along with Defendants' response dated December 19, 2022 and December 21, 2022. (Transaction IDs 68604430, 68686763, 68666949, and 68716708). As indicated during the conference with counsel about the letters, held on December 21, 2022, the Court has reviewed and considered the letters prior to issuing this decision.

The Supreme Court of Delaware has adopted the United State Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals*[3] and its progeny when interpreting a challenge to an expert report under Rule 702. The Supreme Court of Delaware applies the five-part test to determine the admissibility of expert or scientific testimony, which requires the trial judge to decide whether:

(1)   The witness is qualified as an expert by knowledge, skill, experience, training or education;

(2)   The evidence is relevant and reliable;

(3)   The expert's opinion is based upon information reasonably relied upon by experts in a particular field;

(4)   The expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; and

(5)   The expert testimony will not create unfair prejudice or confuse or mislead the jury.[4]

Once expert testimony is challenged, the trial court must ensure that the proffered testimony is both relevant and reliable.[5] "For expert opinion testimony to be relevant under *Daubert*, it must relate to an 'issue in the case' and 'assist the trier

---

[3] *See Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 794 (Del. 2006) ("Though the United States Supreme Court's interpretations of F.R.E. 702 in *Daubert* and *Kumho* are only binding upon federal courts, this Court has expressly adopted their holdings as correct interpretations of D.R.E. 702.") (internal citations omitted).

[4] *Bowen*, 906 A.2d at 795; *Wong v. Broughton*, 204 A.3d 105 (Del. 2019).

[5] *Marydale Preservation Assocs., LLC v. Leon M. Weiner & Assocs., Inc.*, 2022 WL 4394375, at *2 (Del. Super. Sept. 23, 2022) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)).

of fact to understand the evidence or to determine a fact issue."[6]  Although the trial court's Rule 702 inquiry is flexible, the inquiry must be based solely on principles and methodology, not on the conclusions they generate.[7]  The party seeking to introduce expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence.[8]  There is a "strong preference" for admitting expert opinions "when they will assist the trier of fact in understanding the relevant facts or the evidence."[9]

## I.  Plaintiff's *Daubert* Motion to Exclude the Opinions of Lori Lancaster Is DENIED.

Plaintiff makes three main arguments in support of its motion to exclude Lancaster from testifying:

A. Lancaster exceeds her scope as a rebuttal expert by:

1. Rebutting Plaintiff's rebuttal expert, David Adler ("Adler");

2. Rehabilitating Defendants' affirmative expert, Peter Keller ("Keller"); and

3. Presenting new opinions and data to supplement Keller's opinions.

---

[6] *Tumilson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264, 1269 (Del. 2013) (citing *Daubert*, 509 U.S. at 591).
[7] *Id.* (internal quotations and citations omitted).
[8] *Bowen*, 906 A.2d at 795.
[9] *Norman v. All About Women, P.A.*, 193 A.3d 726, 730 (Del. 2018).

B. Lancaster's opinion is unreliable because:

1. It ignores and rejects: the October 2014 Letter written by NGL CEO Mike Krimbill ("Krimbill")[10] and Krimbill's trial testimony; and

2. Lancaster never discussed Krimbill's views on Plaintiff's services or compensation with Krimbill directly.

C. Lancaster makes a credibility determination of Krimbill and thereby impermissibly invades the jury's province to do so.[11]

**A. Lancaster does not impermissibly exceed the scope of a rebuttal expert.**

"Rebuttal evidence is generally defined as evidence that explains, repels, counteracts, or disproves testimony or facts introduced by the adverse party. But purity of effect is not required. The fact that rebuttal evidence also tends to corroborate the party's affirmative case does not require its exclusion."[12] A rebuttal expert is permitted to use new methodologies "for the purpose of rebutting or critiquing the opinions of the [opposing party's] expert witness."[13]

---

[10] Ex. B to Pl. Mot. *in limine* to hold NGL to its judicial admissions and exclude evidence suggesting that the value of LCT's services was less than $29 million [hereinafter "October 2014 Letter"].

[11] Pl. *Daubert* Mot. at 23-27.

[12] *In re Oxbow Carbon, LLC Unitholder Litigation*, 2017 WL 3207155, at *1 (Del. Ch. July 28, 2017).

[13] *Scott v. Chipotle Mexican Grille, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (quoting *Park W. Radiology v. CareCore Nat'l, LLC*, 675 F.Supp.2d 314, 326 (S.D.N.Y.2009).

6

As an initial matter, the Court does not find that Lancaster rebuts Adler in any meaningful way. In footnote one of the Lancaster Report, she indicates that she would be responding to Adler's report to the extent Adler opines on the value of Plaintiff's services.[14] On pages 15-16 of the Lancaster Report, she states that McQuilkin opines that publicly available fee data is "highly variable" and states in a footnote that Adler makes a similar claim.[15] Lancaster clarified during her deposition that, although she was rebutting a portion of Adler's report that is similar to McQuilkin's, Adler and McQuilkin "gave fairly similar views on how they think fee runs are or are not used in determining market-level investment banking fees."[16] A review of McQuilkin's and Adler's reports show that they do in fact provide very similar opinions on this issue. The Court cannot contemplate how Lancaster would be able to rebut those opinions of McQuilkin that are similar to Adler's without also rebutting Adler's opinions. For these reasons, the Court does not find that the Lancaster Report or anticipated testimony amounts to an impermissible sur-rebuttal.

Plaintiff also claims Lancaster exceeds her scope as a rebuttal expert because her opinions are duplicativeof Keller's. A comprehensive review of the Lancaster

---

[14] Expert Report of Lori Lancaster, at 1[hereinafter "Lancaster Report"].

[15] *Id.* at 16, n. 47.

[16] Dep. of Lori Lancaster at 71-72. "So, I'm not rebutting only Mr. Adler's view versus Mr. McQuilkin's, 'cause they're basically the same – they're basically the same view in my reading. I am rebutting that idea, which is contained in both of their reports. . . . they both criticize investment banking fee precedence obtained via fee runs, as non-comprehensive. . . . There is not a separate section of my report that solely discusses Mr. Adler." *Id.* at 72-74.

7

Report shows that it rebuts McQuilkin's opinions with the following assertions: Plaintiff's services were customary investment banking services and were not unusually extensive; Plaintiff's services warranted a standard investment banking fee; and "investment banking services, unlike private equity investment, are not valued by or compensated through value-creation calculations".[17] The fact that Lancaster's rebuttal happens to corroborate Keller's affirmative opinions does not mandate its exclusion.[18]

The Court also does not find that Defendants are impermissibly stacking duplicative experts by their intention to present one affirmative and one rebuttal expert who share some opinions. The purpose of excluding duplicative experts is to prevent undue prejudice to the opposing party from having to depose and rebut several experts "on the same subject matter where one expert witness would be sufficient to make the point."[19] The Court does not find that Plaintiff would be unfairly prejudiced from the presentation of two experts, especially considering that Plaintiff has deposed Lancaster.

Finally, the Court does not find that Lancaster is categorically barred from analyzing "entirely new data" by virtue of her role as a rebuttal expert.[20] McQuilkin

---

[17] Lancaster Report at 1-2.
[18] *In re Oxbow Carbon LLC Unitholder Litigation*, 2017 WL 3207155, at *1 (Del. Ch. July 28, 2017).
[19] *Bingham v. Adobe Equipment Holdings, Ltd.*, 2008 WL 11379993, at *4 (D. Wyo. 2008).
[20] Pl. *Daubert* Mot. at 21.

asserts in his report that there is no typical investment banking fee in the industry.[21]

Lancaster directly rebuts McQuilkin's claim by presenting publicly available fee run data showing a range of fees based on a percentage of the transaction price.[22] Nothing in Rule 702 or the *Daubert* standard prevents this method of rebuttal. If an affirmative expert claims that there is an absence of data, a rebuttal expert is permitted to attempt to rebut that claim by proving the existence and reliability of such data.

## B. Lancaster's opinion is reliable.

Plaintiff argues that Lancaster's decision to not consider and assign greater weight to the October 2014 Letter and Krimbill's trial testimony equates to "cherry picking" evidence to support a foregone conclusion.[23] Even if it were true that Lancaster failed to account for this information, Plaintiff has not provided sufficient evidence that neglecting to do so makes her opinion unreliable. Plaintiff has provided no support that an expert must consider a rejected post-transaction fee proposal to properly opine on an investment banker's fee.

More importantly, Plaintiff's allegations that Lancaster failed to consider this information is demonstrably false. Lancaster dedicates a separate section of her report to McQuilkin's analysis of the parties' negotiations and references the

---

[21] Expert Report of Kevin D. McQuilkin at 5. [hereinafter "McQuilkin Report"].
[22] Lancaster Report at 17.
[23] Pl. *Daubert* Mot. at 23.

9

October 2014 Letter in 5 discrete instances.[24]  Plaintiff also takes issue with the fact that Lancaster disregards the section of the October 2014 Letter in which Krimbill purports that "LCT was able to get [Morgan Stanley] to deal directly with Defendants outside of an auction process."[25]  This portion of the October 2014 Letter is inconsistent with the Wall Street Journal Article on which it is based, which reported bids from Defendants and Buckeye Partners LP among others.[26] Lancaster's opinion is not unreliable for electing to not blindly adopt inaccuracies in the October 2014 Letter.  To the contrary, Lancaster's decision is illustrative of her thorough review of the record and additional documents salient to the transaction.

Plaintiff's contention that the Lancaster Report is unreliable because she did not conduct a separate interview with Krimbill is without merit.[27]  There is no requirement that an expert conduct a separate interview with relevant witnesses.  The Court finds that Lancaster sufficiently familiarized herself with Krimbill's position by reviewing his 500-page deposition transcript.[28]

Finally, Plaintiff contends Lancaster's opinions on a proper damage award are unreliable because they are based on terms the parties never discussed, specifically

---

[24] Lancaster Report at 20-22, 26-27.
[25] *Id*. at 25.
[26] Justin Baer, Christian Berthelsen, & Ryan Dezember, *Morgan Stanley Moves Closer to Oil-Business Sale,* THE WALL STREET JOURNAL (May 23, 2014), https://www.wsj.com/articles/SB10001424052702303749904579580573288840450;  *see* Lancaster Report at 15, n. 44.
[27] *See* Pl. *Daubert* Mot. at 23.
[28] Ex. B to Lancaster Report.

fee run data.[29] This argument is also without merit. The question is whether the bases for Lancaster's opinions are in line with the proper measure of *quantum meruit* damages, not whether they are in line with the parties' negotiations. *Quantum meruit* damages is the sole issue that remains in this case. The parties' motion practice makes evident that a discussion of the proper measure of *quantum meruit* damages is imperative.

*Quantum meruit* is a restitutionary theory of recovery available in a quasi-contractual relationship.[30] A quasi-contract is "one where the law will infer the existence of a contractual relationship without regard to the actual intention of the parties where circumstances are such that justice warrants a recovery as though there had been a promise or contract."[31] *Quantum meruit* damages are based on an objective reasonable valuation of the services provided by reference to the fair market value of those services.[32] A reasonable valuation is "the amount for which

---

[29] Pl. *Daubert* Mot. at 3.

[30] *Middle States Drywall, Inc. v. DMS Properties-First, Inc.,* 1996 WL 453418, at *10 (Del. Super. May 28, 1996) (stating *quantum meruit* is a quasi-contractual remedy); *Caldera Properties-Lewis/Rehoboth VII, LLC, v. Ridings Development, LLC,* 2009 WL 2231716, at *31 ([Q]uantum *meruit* is a principle of restitution arising from a cause of action in quasi-contract.").

[31] *Caldera Properties-Lewis/Rehoboth VII, LLC,* 2009 WL 2231716, at *31; *United Health Alliance, LLC v. United Medical, LLC,* 2014 WL 6488659. at *7 (Del. Ch. Nov. 20, 2014) (internal citations omitted); *Bellanca Corp. v. Bellanca,* 169 A.2d 620, 623 (Del. 1961) ("Quasi-contractual relationships are imposed by law in order to work justice and without reference to the actual intention of the parties.").

[32] *Middle States Drywall, Inc.,* 1996 WL 453418, at *10-11 (*quantum meruit* damages is the "reasonable value of the material or services [Plaintiff] rendered. . . ." as measured by "the amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered."); *Cheeseman v. Grover,* 490 A.2d 175, 177 (Del. Super. Feb. 1, 1985) (holding a party may recover under quantum meruit for the "reasonable value of the

11

such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered."[33]

Lancaster is not required to base her opinions on the parties' negotiations, and her opinions are not unreliable because they rely more heavily on fee run data. Experts opining on *quantum meruit* damages are obligated to base their analysis on an objective valuation of the services provided by reference to data as well as their own specialized knowledge and experiences in the field. The Court also notes that there is evidence demonstrating the parties did consult fee run data during negotiations.[34] Plaintiff's claim that the parties never discussed fee run data is inconsistent with the record in this case.

## C. Lancaster does not make a credibility determination of Krimbill.

Lancaster disagrees with some of Krimbill's characterizations and assertions in the October 2014 Letter. Lancaster disagrees with Krimbill's characterization of his proposed compensation as a "$29 million success fee," his characterization that Defendants purchased TransMontaigne outside of an auction process, and his

---

services rendered, as opposed to the sum agreed to be paid therefor. . . . The alleged agreement for plaintiffs to receive the [decedent's] estate may be relied upon only to show that plaintiffs did not act gratuitously."); DAN B. DOBBS, LAW OF REMEDIES 388 (2d ed. 1993)("A recovery under *quantum meruit* usually appears to mean a recovery for the value of the services, measuring value in the labor market where the service itself was sought by the Defendants.").

[33] *Middle States Drywall, Inc.,* 1996 WL 453418, at *10. *See also Hynansky v. 1492 Hospitality Group, Inc.,* 2007 WL 2319191, at *1 (Del. Super. Aug. 15, 2007); *Caldera Properties-Lewis/Rehoboth VII, LLC*, 2009 WL 2231716, at *31.

[34] JX056; LCT002806.

12

assertion that Defendants would have never had the opportunity to purchase TransMontaigne at the price it did without Plaintiff.[35]

As an initial matter, Krimbill's assessment of Plaintiff's services is his subjective opinion and Lancaster is at liberty to disagree with it; it is not an assertion of fact to be proven true or false. In disagreeing with Krimbill's valuation of his services, Lancaster is not making an accusation that Krimbill is being untruthful. Rather, Lancaster is asserting that her analysis of Plaintiff's services, the context of the transaction, and publicly available fee data lead her to a contrary conclusion.

A thorough review of the Lancaster Report and deposition shows that she critically analyzed Plaintiff's services and assessed their value by a thorough application of sound principles and methods. Lancaster is well within her province as an expert to assess claims in the October 2014 Letter against other evidence on the nature and value of Plaintiff's services. The fact that Lancaster's perspective does not support Plaintiff's claim of damages is irrelevant to her qualifications under Rule 702 or the *Daubert* standard. Lancaster's contrary opinion also does not deprive the jury of its opportunity to weigh Krimbill's testimony. For these reasons, Plaintiff's *Daubert* motion to exclude Lancaster's opinions is DENIED.

---

[35] Pl. *Daubert* Mot. at 25.

**II.    Defendants' *Daubert* Motion to Exclude the Opinions of Kevin D. McQuilkin Is GRANTED IN PART and Defendants' Motion *in Limine* to Exclude Evidence of Value Creation Is GRANTED.**

Defendants seek to exclude McQuilkin's testimony on the following grounds:

(1) McQuilkin does not use reliable methodology in forming his opinions because he impermissibly engages in *ipse dixit*.[36]

(2) McQuilkin's opinions violate the law of the case.

(3) McQuilkin impermissibly relies on the rejected "value creation" theory of damages.

Defendants have also filed a separate motion *in limine* to exclude evidence of value creation. Because this motion *in limine* overlaps with the section of Defendants' *Daubert* motion related to value creation evidence, the Court will address these value creation arguments together.

**A. McQuilkin's opinions that amount to *ipse dixit* are excluded.**

The Court finds that a portion of the McQuilkin Report is unreliable because it equates to *ipse dixit. Ipse dixit* is Latin for "he himself said it" and stands for the general prohibition of opinions supported only by the qualifications of the expert

---

[36] Defendants' *Daubert* motion also alleges that McQuilkin impermissibly relies on undisclosed information. Def. *Daubert* Mot. at 13. On November 9, 2022, after the parties presented argument on this motion, the Court ordered Plaintiff to disclose McQuilkin's undisclosed deal information to Defendants' attorneys only, and permitted Defendants to take McQuilkin's deposition to examine him about these transactions. *LCT Capital, LLC v. NGL Energy Partners LP*, Del. Super., C.A. No. N15C-08-109, Adams, J. (Nov. 9, 2022), Judicial Action Form. Information gathered from the deposition shall be for attorneys' eyes only as well. *Id.* As of the issuance of this order, the Court understands that the discovery is proceeding in compliance with the Court's ruling.

14

that cannot be reasonably traced to other authority or proof.[37]  A court is under no obligation "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[38]

Defendants provide five examples of McQuilkin's opinions that Defendants argue are *ipse dixit*.[39]  The Court addresses each in turn.  In examples one and two, McQuilkin opines that 22-30% of the deal price, or a floor of $43.8 million, is a reasonable compensation for Plaintiff's services.  The Court finds that these two examples qualify as *ipse dixit*.  McQuilkin's deposition confirms that he could not tie this opinion to anything in his prior experience.  The closest example McQuilkin could provide was a fee that was 10% of the deal price.[40]  There is little doubt that McQuilkin's calculation of damages as shown in the above examples is derived from the proposed fee arrangement rather than his 35 years of experience as an investment banker.

The fact that McQuilkin's opinions, as contained in the first two examples of *ipse dixit*, are derived from the proposed fee arrangement in the October 2014 Letter provides a separate basis for their exclusion.[41]  As shown in Section VII.B. of the

---

[37] Black's Law Dictionary 847 (8th ed. 2004).
[38] *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).
[39] Def. *Daubert* Mot. at 10-11.
[40] Dep. of McQuilkin at 98-99.
[41] McQuilkin Report at Section VII.B.3.  In Section VII of the McQuilkin Report, titled "Value of LCT's Services Based on the Negotiations/Alleged Oral Agreement" McQuilkin calculates the

McQuilkin Report, the range of compensation of $43.8-$60 million is a direct derivation of the equity buy-in transaction proposed in the October 2014 Letter, based on McQuilkin's valuation of the NGL GP.[42] As the Court discusses in detail below, benefit-of-the bargain damages are an impermissible measure of *quantum meruit* damages. McQuilkin is not permitted to testify to damages based on Plaintiff's expectation interests in the agreement it purports to have reached with Defendants.

With respect to the third example in Defendants' motion, McQuilkin is permitted to testify to the general proposition that the nature and extent of services justifies higher compensation. The Court appreciates the inherent difficulties in distilling investment banker services into a purely mathematical calculation and understands that there is not a perfect linear relationship between the type, extent, and combination of services on the one hand, and compensation on the other. Both parties' experts appear to agree that there is a great degree of variability in investment banking advisory fees.[43] McQuilkin testified in his deposition that it is difficult to quantify how certain variables impact the fee—when the advisor generates the idea to the client, for example—in part because it is typically only one

---

value of the allegedly promised compensation (VII.B.) from the value of the NGL GP, which equates to 22%-30% of the $200 million transaction price.

[42] *Id.*

[43] *Id.*; Dep. of Kevin D. McQuilkin at 96-97; *see also* Lancaster Report at 17.

16

variable among a host of others.[44]  The Court finds that McQuilkin has a reasonable basis for making this assertion based on his 35 years of experience in the field.  The question of whether McQuilkin can testify to specific examples of particular services resulting in higher fees can be properly addressed on cross-examination.

The Court does not find that Defendants' fourth example, McQuilkin's statement in his report and deposition testimony that value creation is an important factor in negotiating fees, is *ipse dixit*, but limits the extent to which McQuilkin can testify about value creation.[45]  McQuilkin, however, is permitted to testify about whether he or former colleagues discussed with clients speculative value created by a proposed transaction.  McQuilkin is precluded from testifying to his mathematical calculation of the value created to NGL by the transaction or the cash equivalent of the proposed equity buy-in arrangement that is derived from that post-acquisition valuation.[46]

During McQuilkin's deposition, he provided sufficient testimony demonstrating that, in his experience, value creation is a relevant factor in fee negotiations.[47]  Although McQuilkin could not quantify how value creation increased the fee or recall examples of when speculative value creation increased the

---

[44] Dep. of McQuilkin at 98-101.
[45] Def. *Daubert* Mot. at 11. *See infra* at Section II.B.-C. for the Court's discussion of applying value creation methodology to the proposed equity buy-in transaction as memorialized in the October 2014 Letter.
[46] McQuilkin Report at Section VII.
[47] Dep. of McQuilkin at 147-49.

17

fee, he testified at his deposition that there were multiple instances where the negotiation involved a discussion of the value the proposed transaction could create as one factor among many.[48] McQuilkin affirmed that, in his experience, clients were willing to pay higher fees based on speculative value creation.[49] McQuilkin testified to the practical difficulties in determining what proportion of a fee was a result of speculative value creation as opposed to other components.[50]

Plaintiff has shown by a preponderance of the evidence that McQuilkin is sufficiently qualified as an expert on investment banker fees to testify about discussing value creation with clients. The Court is not in a position to find that investment bankers do not discuss value creation with their clients or that valuation creation has no influence in fee negotiations. Whether McQuilkin can testify to concrete examples and provide a mathematical description of the relationship between value creation and an investment banker's fee should be determined through cross-examination.

With respect to the fifth example in Defendants' motion, to the extent McQuilkin was aware of other investment bankers in the field receiving equity compensation as financial advisory fees, he is permitted to testify to this.[51] The basis

---

[48] *Id.* at 148.
[49] *Id.* at 147-48.
[50] *Id.* at 148-49.
[51] Def. *Daubert* Mot. at 11.

for this opinion can be addressed through cross-examination. The Court reiterates that McQuilkin cannot base his opinion of *quantum meruit* damages on the proposed equity buy-in transaction contained in the October 2014 Letter.

**B. McQuilkin's Reliance on the Parties' Alleged Promised Compensation as Contained in the October 2014 Letter Violates the Law of the Case and Case Law on *Quantum Meruit* Damages**

In his report, McQuilkin provides opinions based on the parties' negotiations, alleged oral agreement, and the proposed fee agreement in the October 2014 Letter.[52] The extent to which McQuilkin's opinions, based on the proposed fee arrangement in the October 2014 Letter, are admissible at trial can be informed by a review of *quantum meruit* damages—the one issue remaining in the case—as well as those claims that are no longer in the case.[53] In the context of *quantum meruit*, evidence of an alleged agreement is only permitted to rebut an allegation that the plaintiff provided the services gratuitously.[54] Here, Defendants have conceded that Plaintiff provided services and that it was on notice that Plaintiff expected to be paid for those services.[55] This concession obviates Plaintiff's need to present evidence of an alleged agreement.

---

[52] McQuilkin Report at Section VII-VIII.

[53] *See supra* Section I.B. n. 30-33 and accompanying text for the proper measure of *quantum meruit* damages.

[54] *Cheeseman v. Grover*, 490 A.2d 175, 177 (Del. Super. Feb. 1, 1985) ("The alleged agreement for plaintiffs to receive the [decedent's] estate may be relied upon only to show that plaintiffs did not act gratuitously").

[55] *See Hynansky v. 1492 Hospitality Group, Inc.*, 2007 WL 2319191, at *1 (Del. Super. Aug. 15, 2007) (holding to prevail on quasi-contract theory plaintiff must show he provided services with the expectation of payment and that Defendants was on notice of this expectation).

19

There is no longer a contract claim or fraud claim left in the case. In its breach of contract claim, Plaintiff "alleged that [Plaintiff] and [Defendants] formed an oral contract based on the fee that Krimbill purportedly offered to Louis C. Talarico, III, the principal of Plaintiff LCT Capital, LLC, in May 2014."[56] In July 2018, the Superior Court granted Defendants' motion for summary judgment and dismissed Plaintiff's breach of contract claim finding that "neither party manifested objective assent . . . ." and that "the essential terms were not sufficiently definite . . . . [s]pecifically [Plaintiff's] finder's fee."[57]

With respect to Plaintiff's fraud claim, the Supreme Court reasoned that Plaintiff "presented a unitary theory of damages" which "focused exclusively on the value of the services that it provided" and did not include evidence of damages independently caused by Defendants' alleged fraudulent conduct.[58] The Supreme Court held that "where the defendant's fraud did not induce the plaintiff to form a contract, out-of-pocket damages typically measure the full scope of plaintiff's injuries."[59] Because Plaintiff's contract claim was dismissed, the Supreme Court found that Plaintiff was limited to seeking out-of-pocket damages for the fair value of services that it provided, not benefit-of-the-bargain damages.[60] The Supreme

---

[56] *LCT Capital, LLC v. NGL Energy Partners LP*, 249 A.3d 77, 85 (Del. 2021); Compl. ¶ 152-160.
[57] *LCT Capital, LLC v. NGL Energy Partners LP*, Del. Super., C.A. No. N15C-08-109, at *21-22, Carpenter, J. (July 19, 2018) ( Mem. Op.).
[58] *LCT Capital, LLC*, 249 A.3d at 95.
[59] *Id.* at 94.
[60] *Id.* at 98.

20

Court found that out-of-pocket damages were "identical to the compensation that LCT [was] entitled to receive for its *quantum meruit* claim."[61] The Supreme Court therefore held that the Superior Court abused its discretion in ordering another trial on fraud damages and struck the jury's fraud verdict because Plaintiff could not recover for the same loss twice. [62]

It appeared to the Supreme Court that Plaintiff sought "benefit-of-the-bargain damages solely to protect its expectation interests in the bargain that Krimbill proposed but the parties never formed because they could not agree on all of the material terms."[63] The Supreme Court held that this was a remedy Plaintiff could not receive and acknowledged the inherent challenges in fairly and accurately valuing the benefit of a bargain the parties never formed.[64] The Court noted that:

> "[e]ven if the details of Krimbill's offer are ascertainable, we do not know what terms the parties would have agreed to because the parties never agreed to all of the material terms of [Plaintiff's] fee . . . . This uncertainty also creates a risk that benefit-of-the-bargain damages would provide [Plaintiff] with a windfall by awarding [Plaintiff] with the benefit of a generous bargain to which [Defendants] would not have agreed. Such a windfall would be contrary to Delaware law."[65]

---

[61] *Id.*
[62] *Id.* at 97-98. "[Plaintiff's] fraud claim failed because it was not supported by damages independent from the *quantum meruit* claim." *Id.* at 98.
[63] *Id.* at 95.
[64] *Id.* at 95-96.
[65] *Id.* (internal citations omitted).

The Supreme Court's decision makes clear that the benefit Plaintiff asserts it would have received from the unconsummated contract should not factor into *quantum meruit* damages. McQuilkin's opinions stemming from Sections VII-VIII of his report which value Plaintiff's services based on the parties' alleged promised compensation, and portions of Section IX that make reference to the October 2014 Letter, are therefore excluded.[66] McQuilkin is not permitted to testify to the estimated cash value of the equity buy-in proposal based on his calculation of the value created from the transaction of the NGL GP.[67]

With respect to Section VIII ("The October 24, 2014 Letter"), McQuilkin's opinions derived from those portions of the October 2014 Letter that relate to the fee proposal are excluded.[68] Opinions derived from those portions of the October 2014 Letter that speak only to the nature and quality of the services provided are permitted. For clarity, below are the excerpts from the October 2014 Letter that the parties' experts are precluded from testifying to:

- "We are proposing that LCT acquire 5% for our NGL General Partner for a $21 million purchase price. We would like to have the NGL General Partner purchase this 5% for $50 million so there is no dilution ($1 billion enterprise value), and then sell it to LCT. This equates to a $29 million success fee which appears high compared to a typical 1%-2% investment banker success fee. We are looking at the fee from the perspective of the value created to the NGL General Partner. . . ."

---

[66] McQuilkin Report at Sections VII-IX.
[67] *Id.* at Section VII.
[68] *Id.* at Section VIII.

- Paragraphs 1, 3, and 7 of the October 2014 Letter are excluded, except for the following excerpt in paragraph 7: "we never would have had this opportunity at our price without LCT bringing it to us."[69]

McQuilkin is permitted to testify to his specialized knowledge and experience of how investment banker fees are determined (Section VI), with the exception that he is not permitted to testify based on the following sentence: "In my judgment, [Plaintiff's] approach of seeking equity as compensation rather than cash is the purest form of alignment of interests with a client."[70] McQuilkin is also permitted to testify to his assessment of the nature, quality, and scope of the services Plaintiff provided as indicated in the first four paragraphs of Section IX of his report.[71] McQuilkin is not permitted to testify to the remainder of Section IX that relates to his opinions on value created to Defendants from the transaction and its relation to Plaintiff's damages.[72]

### C. McQuilkin's Mathematical Calculation of *Quantum Meruit* Damages Derived from a Value Creation Theory of Damages are excluded

Defendants contend that damages under *quantum meruit* are calculated without reference to the value created or benefit received from the services provided.[73] In addition to the reasons stated in the preceding section, McQuilkin is precluded from testifying to his calculations of damages that are based on value

---

[69] Ex. C to Def. *Daubert* Mot.
[70] McQuilkin Report at Section VI.
[71] *Id.* at Section IX.
[72] *Id.*
[73] Def. *Daubert* Mot. at 20.

created to Defendants from the transaction because this methodology is contrary to the law of the case and relevant case law.[74]

This Court has already ruled that Plaintiff was not permitted to introduce evidence or testimony based on a value creation theory of *quantum meruit* damages.[75] After Plaintiff made reference to the value created by the transaction during its opening argument at the first trial, the Court emphasized that it was not going to permit any expert to testify to calculations of *quantum meruit* damages based on value created to Defendants.[76] The jury instructions also stated that the value of services under *quantum meruit* "is not measured by reference to any value created after [Defendants'] acquisition of TransMontaigne."[77] Plaintiff did not object to this instruction and the Supreme Court found on appeal that Plaintiff had waived this issue.[78] In addition to the law of this case, as a general matter, Delaware case law holds that recovery under *quantum meruit* damages is the value of the services provided, not the value of the benefit received.[79] There has been no change in the facts of this case or relevant case law to merit a change in course now.

---

[74] McQuilkin Report at Sections VII-IX.

[75] *See infra* n. 75-77 and accompanying text.

[76] *LCT Capital, LLC v. NGL Energy Partners LP*, C.A. No. N15C-08-109 (WCC) (July 24, 2018) (TRANSCRIPT at 17).

[77] *LCT Capital, LLC v. NGL Energy Partners LP*, 2018 WL 4600489 (2018) (Jury Instructions).

[78] *LCT Capital, LLC v. NGL Energy Partners LP*, 249 A.3d 77, 102 (Del. 2021).

[79] *Hynansky v. 1492 Hospitality Group, Inc.,* 2007 WL 2319191, at *1 (Del. Super. Aug. 15, 2007) (the value of services under quantum meruit is "not the value of the benefit received" but the "amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered."); *Marta v. Nepa,* 385 A.2d 727, 730 (Del. 1978)

This Court also notes that admitting value creation evidence would likely confuse and mislead the jury. Admitting such evidence would require the parties to present a multitude of additional evidence and testimony for the jury to distinguish between the value created from Plaintiff's services and value created independent of its involvement. The value created by the acquisition was a result of the complex interplay of myriad factors beyond the control of Plaintiff. The introduction of such evidence would most likely present intractable causation issues for the jury which is likely to result in their confusion and a windfall for Plaintiff that *quantum meruit* damages does not permit.

### III. Plaintiff's Motion *in Limine* to Hold Defendants to Judicial Admissions and Exclude Evidence Suggesting That the Value of Plaintiff's Services Was Less Than $29 Million is DENIED.

The Court's analysis of this motion begins with a brief review of the claims remaining in this case and the testimony provided by Krimbill at the first trial. The Superior Court dismissed Plaintiff's breach of contract claim in 2018.[80] On appeal, the Supreme Court struck the jury's fraud verdict and held that Plaintiff's fraud claim failed.[81] The one claim remaining in this case is *quantum meruit* damages.[82]

---

(holding that evidence on remand should include testimony by expert witnesses "as to the worth of the specific services rendered to [Defendant] by [Plaintiff] and the reasonable compensation which [plaintiff] deserves therefor."). *See also supra* n. 30-33 and accompanying text.

[80] *See supra* Section II.B., n. 56-57 and accompanying text.

[81] For a detailed discussion of the outcome of Plaintiff's fraud claim see *supra* Section II.B., n. 58-62 and accompanying text.

[82] *See supra* I.B., n. 30-33 and accompanying text for the proper measure of *quantum meruit* damages.

At trial, on direct examination, Krimbill testified that "we certainly had 5% for $21 million."[83] Again on direct, when examined about whether Krimbill's fee recommendation in the October 2014 Letter which "equates to a $29 million success fee," was an accurate statement when he wrote it, Krimbill responded "yes."[84] Krimbill confirmed through his testimony that the following statement in the October 2014 Letter was true: "I feel this is a fair arrangement, although seemingly expensive, as we would never have had this opportunity at our price without LCT bringing it to us."[85]

In this motion *in limine,* Plaintiff asserts that Krimbill's testimony regarding his views on Plaintiff's compensation is a judicial admission. In essence, Plaintiff asserts that $29 million should constitute the floor for *quantum meruit* damages and that Defendants should not be permitted to submit evidence or elicit testimony that anything less than that amount is an appropriate damage award.[86]

The Supreme Court of Delaware defines judicial admissions as "[v]oluntary and knowing concessions of fact made by a party during judicial proceedings" which include statements contained in testimony.[87] Judicial admissions, which "are

---

[83] *LCT Capital, LLC v. NGL Energy Partners LP*, C.A. No. N15C-08-109, (WCC) (July 27, 2018) (TRANSCRIPT at 55).
[84] *LCT Capital, LLC v. NGL Energy Partners LP*, C.A. No. N15C-08-109, (WCC) (July 26, 2018) (TRANSCRIPT at 30).
[85] *Id.*
[86] Pl. Mot. to Hold Defendants to its Judicial Admissions, at 6, 9.
[87] *Merritt v. United Parcel Service*, 956 A.2d 1196, 1201 (Del. 2008).

traditionally considered conclusive and binding both upon the party against whom they operate, and upon the court"[88] are distinct from evidentiary admissions, which may be controverted or explained by the adverse party.[89]  The court may, in its sound discretion, relieve a party from the conclusiveness of its judicial admission.[90]

The definition of a judicial admission and the law of the case dictate that Plaintiff's motion be denied.  The Court finds Krimbill's testimony that "we certainly had 5% for $21 million" and his testimony confirming the statements in the October 2014 Letter are not judicial admissions because they are *not concessions of fact* as to the minimal monetary value of Plaintiff's services.

The Court finds the testimony, "we certainly had 5% for $21 million," is a subjective perception regarding the parties' negotiations about an appropriate fee and nothing more.  Krimbill's testimony confirming the statement in the Letter that "*I feel* this is a fair arrangement  . . ."[91] is evidence of the subjective nature of his views.  While it may be a fact that Krimbill *believed* the parties had reached such an agreement and that he *believed* the arrangement was fair, it does not necessarily follow that the parties did reach an agreement or that the alleged agreement is in fact fair.  Plaintiff here conflates beliefs and facts.  A belief may or may not be an

---

[88] *Id.* at 1201-02.
[89] *Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir. 1995).
[90] *Merritt,* 956 A.2d at 1202.
[91] October 2014 Letter. (emphasis added).

27

expression of fact. The very purpose of this trial is for the jury to determine the fair monetary value of Plaintiff's services based on competing expert testimony and the parties' conflicting beliefs and opinions. The Court declines Plaintiff's request to end this trial before it begins.[92]

Through this motion, Plaintiff essentially seeks to controvert this Court's dismissal of its breach of contract claim by asking this Court to enter as a judicial admission an alleged agreement on Plaintiff's fee. The Court cannot allow this.

The Court also finds that qualifying Krimbill's testimony as a judicial admission would directly conflict with the Supreme Court's holding in this case. If the Supreme Court intended to anchor the jury to a floor of $29 million, it would

---

[92] Even if the testimony that "we certainly had 5% for $21 million," was a concession of fact, entering this testimony as a judicial admission would convert it into at least a mixed finding of fact and law, and in so doing contradict the definition of a judicial admission. *Eagle Force Holdings, LLC v. Campbell,* 187 A.3d 1209, 1213 (Del. 2018) ("whether the contract's terms are sufficiently definite, is largely a question of law."); *AT&T Corp. v. Lillis*, 953 A.2d 241, 248 (Del. 2008) quoting *Lillis v. AT&T Corp.*, 896 A.2d 871, 877 n. 10 (Del. Ch. 2005) ("judicial admissions apply only to admissions of fact, not to theories of law, such as contract interpretation"); *Twin Willows, LLC v. Pritzkur*, 2022 WL 3039775, at *6 (Del. Ch. 2022) ("Judicial admissions which are binding on the tendering party are limited to factual matters in issue and not to statements of legal theories or conceptions.") (internal citations omitted). Under Delaware law, whether terms are sufficiently definite to form a contract is largely a question of law. *Eagle Force Holdings, LLC v. Campbell*, 235 A.3d 727, 732 (Del. 2020) (affirming its reasoning in *Eagle Force Holdings, LLC v. Campbell,* 187 A.3d 1209, 1213 (Del. 2018) that "whether the contract's terms are sufficiently definite, is largely a question of law.") Converting Krimbill's testimony that "we certainly had 5% for $21 million" to a judicial admission would be converting it to a concession of a theory of law, namely that there was an express agreement regarding a particular term of compensation. Such a conversion would be in direct violation of the definition of a judicial admission. Admitting Krimbill's testimony as evidence of a definite agreement on minimum compensation would in effect reverse the settled law of the case: there was no contract. *LCT Capital, LLC v. NGL Energy Partners LP*, Del. Super., C.A. No. N15C-08-109, Carpenter, J. (July 19, 2018) ( Mem. Op.). The law of the case dictates that Plaintiff's finder's fee was not sufficiently defined. *Id.*

28

have taken the opportunity to do so. To the contrary, the Supreme Court found that the jury may have determined $4 million was the fair value of Plaintiff's services under *quantum meruit*.[93] Binding the jury in the upcoming trial to $29 million would prohibit its ability to make a decision based on the evidence presented.[94]

## IV. Plaintiff's Motion *in Limine* to Exclude Evidence of a "Typical" Investment Banker Fee As Irrelevant to Quantum Meruit Damages Is DENIED.

Plaintiff argues that evidence of a typical fee should be excluded because the parties never discussed typical investment banker fees during their negotiations over Plaintiff's compensation.[95] Plaintiff also argues that the inclusion of such evidence is contrary to case law on *quantum meruit* damages.[96]

Pursuant to the Delaware Rules of Evidence, evidence is admissible if it is relevant unless it is otherwise excluded by a statute, the rules of evidence, or other rules applicable to the courts in this state.[97] Evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence.[98] Even if the evidence is relevant, the Court has discretion to exclude it if its probative value is

---

[93] *LCT Capital, LLC v. NGL Energy Partners LP*, 249 A.3d 77, 101 (Del. 2021).

[94] The Court is not ruling that Krimbill's testimony from the prior trial is completely excluded. The Court only rules that the testimony is not a judicial admission.

[95] Pl. Mot. to Exclude Evidence of a Typical Investment Banker Fee as Irrelevant to Quantum Meruit Damages, at 2 [hereinafter "Pl. Mot. to Exclude Typical Fee Evidence"]. *See supra* Section I.B. for the Court's disposition of this argument.

[96] *Id.* at 6.

[97] D.R.E. 402.

[98] D.R.E. 401.

substantially outweighed by a danger of one or more of the factors listed in D.R.E. 403.[99] Considering the low evidentiary threshold for relevance and the proper measure of *quantum meruit* damages, the Court finds that expert testimony on typical investment banker fees is relevant to determining the reasonable value of the services Plaintiff provided in this case.[100]

The Court does not find that the risk of unfair prejudice to Plaintiff from presenting evidence of a typical fee will substantially outweigh the probative value of that evidence.[101] Although the Court recognizes the shortcoming of fee run data, the jury can assess the reliability of this evidence through Plaintiff's cross-examination of Defendants' experts. It is within the jury's province and ability to consider the differing valuations of Plaintiff's services as provided by the parties' experts. Excluding this evidence would do more to unfairly prejudice Defendants. Both parties will have ample opportunity to present evidence regarding the nature and extent of the specific services and the appropriate compensation for these services.

---

[99] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." D.R.E. 403.
[100] *See supra* I.B., n. 30-33 and accompanying text for the proper measure of *quantum meruit* damages.
[101] D.R.E. 403.

The case law also does not require the exclusion of this evidence. Plaintiff relies heavily on *Marta v. Nepa*[102] in support of its argument that a standard commission is not relevant to *quantum meruit* damages. The Supreme Court in *Marta* reversed the Superior Court's award of a 4% commission to the plaintiff-real estate broker and remanded for an evidentiary hearing on the issue of damages.[103] The court reasoned that a standard commission was "neither equivalent to nor commensurate with the evidence required for determining a recovery based on *quantum meruit*" and "may or may not" reflect the value of the services provided.[104] The Supreme Court instructed that the evidence offered on remand "should include opinion testimony by expert witnesses, in response to hypothetical questions based upon the particular facts of this case, as to the worth of the specific services rendered. . . ."[105] The Supreme Court ordered the Superior Court to consider evidence in the form of expert testimony in addition to, not to the exclusion of, evidence of a standard commission.[106]

The Court here also finds that there is less of a risk that the jury here will make an erroneous decision from this type of evidence than in *Marta*. As indicated by the

---

[102] 385 A.2d 727 (Del. 1978).
[103] *Id.* at 730.
[104] *Id.*
[105] *Id.*
[106]*Id.* On remand, the Superior Court considered testimony from the plaintiff's and the Defendants' experts regarding standard commissions and the Supreme Court affirmed. *Nepa v. Marta*, 415 A.2d 470, 472 (Del. 1980).

31

Supreme Court in *Marta*, standard commissions for real estate brokers are prospective in that they are determined before the services are provided and, for this reason, may not be an accurate reflection of the work done.[107] In contrast, Defendants' experts opine in their reports that investment banking fees tend to be at least partially retrospective.[108] The experts on both sides in this action opine that investment banking fees tend to be agreed upon midstream when some of the services have already been provided and when the scope of future work is more ascertainable.[109] Typical investment banker fees are likely to be more closely aligned to *quantum meruit* damages, which is a retrospective remedy, than standard commissions for real estate brokers.[110]

Additionally, unlike real estate broker commissions that are selected from a single standard, the Lancaster Report reflects a broad range of fees that vary based on the level of services.[111] It appears to the Court that applying data on typical

---

[107] *Marta,* 385 A.2d at 730.

[108] *See* Lancaster Report at 24 ("advisors are primarily involved in a transaction prior to signing of definitive agreements."); Def. Opp. To Pl. Mot. to Exclude Typical Fee Evidence at 6-7.

[109] *Id.* Dep. of McQuilkin at 45, 47 ("[Y]ou have to get an idea of what's going to happen before you have a reasonable view of what the fees should be. . . . It is typical in the industry, especially when working with financial sponsors, that they will say, we'll work it out later. And your leverage as a banker, in a very competitive business where you are trying to win and work with important clients that you just – you have to trust them.").

[110] *See Middle States Drywall, Inc. v. DMS Properties-First, Inc.,* 1996 WL 453418, at *11 (Del. Super. May 28, 1996) ("*Quantum meruit* is a retrospective remedy which looks at what was *actually* received by the defendant, rather than a prospective remedy which looks at what the defendant *expected* to receive.") (emphasis in original).

[111] *See* Lancaster Report at 17. The largest fee in Lancaster's data set is 71 times greater than the smallest fee. *Id.*

investment banker fees to this case has a greater potential to accurately value Plaintiff's services as compared to standard commissions in the real estate broker context.

The Court further notes that the expected presentation of such evidence is not novel to this case or within *quantum meruit* case law.[112] Plaintiff has provided no compelling reason why this Court should depart from prior evidentiary decisions in this case. For these reasons, Plaintiff's motion to exclude evidence of a typical fee is hereby DENIED.

## V. Defendants' Motion *in Limine* to Preclude Evidence or Argument Regarding Any Alleged Agreement Between the Parties Is GRANTED.

In this motion, Defendants seek to preclude all evidence and testimony regarding an alleged agreement or contract between the parties regarding compensation for Plaintiff's services. As discussed, the Superior Court has already

---

[112] Plaintiff consulted fee run data during its negotiations with Defendants (JX056; *see* Dep. of McQuilkin at 92-93), Plaintiff's own expert at the first trial testified that investment banks regularly use fee run data to negotiate the value of their services (JX056), and evidence of a typical fee derived from fee run data was also presented at the first trial in this matter. For cases that have admitted evidence of standard or typical fees to support *quantum meruit* damages, *see Bellanca Corp. v. Bellanca*, 169 A.2d 620, 622 (1961); *Glissman v. Gross*, 2018 WL 3660357, at *6 (S.D. Ga. Aug. 2, 2018) (holding "typical charge for services is evidence of value conferred in a quantum meruit claim . . . ."); *Sanjiv Goel, M.D., Inc. v. Regal Med. Grp., Inc*. 11 Cal. App. 5th 1054, 1063 (Cal. Ct. App. 2017) (holding trial court properly considered Defendants expert's testimony concerning fees charged by other providers for similar services for plaintiff's *quantum meruit* claim); *Learning Annex Holdings v. Rich Global*, 2012 WL 2878124, at *5 (S.D.N.Y. July 13, 2012) (holding plaintiff provided sufficient evidence for jury to find that compensation for licensing agents is typically based on a percentage of royalty revenues).

33

dismissed Plaintiff's breach of contract claim.[113] The Supreme Court affirmed the Superior Court's holding that Plaintiff was not entitled to benefit-of-the-bargain damages because Defendants' alleged fraud did not induce Plaintiff to form a contract.[114] *Quantum meruit* damages is the one issue remaining in this case and is to be calculated independent of any alleged agreement."[115]

Plaintiff cites *Pike Creek Professional Center v. Eastern Elec. & Heating, Inc.*[116] and *Bellanca Corp. v. Bellanca*[117] to support its position that the parties' alleged agreement is admissible to show the value of its services. Neither *Pike Creek* nor *Bellanca* stand for the proposition Plaintiff asserts. In *Pike Creek*, there was a contract between the parties and the plaintiff was permitted to submit the contract price as an admission of value.[118] Similarly, in *Bellanca,* the plaintiff alleged a breach of an express contract and, after presenting his case in chief, amended his complaint to include recovery on a *quantum meruit* basis.[119] Because the plaintiff in

---

[113] *LCT Capital, LLC v. Defendants Energy Partners LP*, Del. Super., C.A. No. N15C-08-109, at *21-22, Carpenter, J. (July 19, 2018) (Mem. Op.).

[114] *LCT Capital, LLC v. Defendants Energy Partners LP*, 249 A.3d 77, 92-95 (Del. 2021).

[115] *See supra* Section I.B., n. 30-33 and accompanying text for the definition of *quantum meruit* damages. *See also Pike Creek Professional Center v. Eastern Elec. & Heating, Inc.,* 540 A.2d 1088 (TABLE),1998 WL 32028, at *2 (Del. 1988) (affirming trial court's *quantum meruit* award that excluded plaintiff's bargained-for profits).

[116]1987 WL 9610 (Apr. 7, 1987), *aff'd* 540 A.2d 1088.

[117] 169 A.2d 620 (Del. 1961).

[118] 1988 WL 32028, at *2 ("In meeting its burden of establishing the reasonable value of the benefit conferred, [Plaintiff] was properly permitted to introduce the contract price 'as evidence of an admission by the parties of [the] value of Plaintiff's services'") (quoting *Emerson v. Universal Products Co.*, 162 A.2d 779, 881 (Del. Super. Oct. 17, 1932).

[119] *Bellanca,* 169 A.2d at 621-22.

*Bellanca* claimed the defendant breached an express contract, the plaintiff was permitted to testify to the compensation allegedly agreed upon as evidence of the value of his services.[120]  Unlike in *Pike Creek* and *Bellanca*, in the present case there is no contract and thus no basis to submit evidence of compensation to which the parties allegedly agreed.

For these reasons, the following terminology, or any substantially similar word or phrase that a reasonable juror would equate with these terms, is EXCLUDED:

- "an oral contract"
- "verbal contract"
- "agreement"
- "verbal agreement"
- "agreed to"
- "the fee agreement"
- "our deal"
- "the contract"
- "the amount promised"

Neither party is permitted to frame, characterize or qualify any negotiations, discussions, or proposals as culminating in a shared agreement, contract, promise or resolution of the issue of compensation.  The Court acknowledges the inherent challenges in applying this ruling at trial.  Considering the unique facts of this case, the Court anticipates that the distinction between negotiations and an alleged agreement may at times be difficult to discern.  This concern should be adequately

---

[120] *Id.*

addressed through timely objections and sidebar discussions between the Court and counsel.

Although the Court is prohibiting any evidence of an alleged agreement regarding compensation, this does not bar the parties from submitting evidence or eliciting testimony of fee negotiations, to the extent that they make no reference to value created by the transaction or the equity buy-in proposal. Some or perhaps most evidence relating to the parties' fee negotiations is subjective in nature insofar as it conveys the parties' perceptions of value, as opposed to publicly available fee run data on investment banker fees. The Court acknowledges that admitting evidence of subjective perceptions of value is contrary to case law stating that *quantum meruit* damages are to be based solely on objective measures of a plaintiff's services.[121] Considering, however, that the publicly available fee run data includes as little as 5% of all merger and acquisition transactions,[122] the Court finds that the jury should

---

[121] *See supra* Section I.B., n. 30-33 and accompanying text for a discussion of the measure of *quantum meruit* damages.

[122] *See* McQuilkin Report at Section VI (publicly available fee data "only includes a very small subset of actual negotiated fees because only publicly disclosed fees are used. Public fee disclosure generally only results from the filing of a proxy statement (or other public disclosure) on a deal, which happens infrequently to begin with and, when focused on buy-side fees [. . .] few proxies (for example) will include such information as the audience tends to be the seller's shareholders, not the buyer's."); When explaining the sample size in the Refinitiv Eikon data Lancaster analyzed in the Report, which had a sample size of 50 deals between 2000-2016 with a transaction price of $100million-$1 billion, she testified, "Does it represent a material portion of the deals in that time period? No, for the reason we've talked about: These are publicly available fees." Dep. of Lancaster at 160, Lancaster Report at 17; Adler Report at 5 ("[I]n the United States, there are thousands of M&A transactions each year as reported in publicly-available [sic] sources such as the Wall Street Journal. Only a very small fraction of these transaction involved public companies (typically less than 5% of all M&A transactions). As a result, the fees paid on the overwhelming

not be solely confined to hearing this evidence, but should have the opportunity to weigh this evidence against the parties' discussions of the appropriate fee for Plaintiff's services. The Court finds that permitting the jury to consider testimony and evidence on typical investment banker fees together with the parties' fee negotiations (excluding discussions of value creation and the equity buy-in proposal) will increase the likelihood of an appropriate damage award.

The Court notes that it is not breaking new ground in this case by permitting evidence of the parties' fee negotiations. As stated in the Superior Court's 2018 Memorandum Opinion on Defendants' motion for summary judgement, this evidence remains relevant to the parties' perceptions of the value of the services provided.[123] The Superior Court held that Plaintiff could submit this evidence as probative of the appropriate damage award.[124] It also appears to the Court that the Supreme Court agreed that this evidence could support a *quantum meruit* damages award.[125] For the reasons discussed, while the parties may submit evidence and elicit

---

majority of M&A transactions are not publicly-available [sic]. Moreover, anyone who bases an advisory fee solely on a fee run, is missing more than 95% of the market.").

[123] *LCT Capital, LLC v. NGL Energy Partners LP*, Del. Super., C.A. No. N15C-08-109, at *23-24, Carpenter, J. (July 19, 2018) ( Mem. Op.) ("[T]he Court wants to be clear that it is in no way implying conversations, discussions, communications and emails between the parties and their representatives are no longer relevant. They are. If the CEO of NGL made representations that he believed the compensation package suggested by LCT was fair and appropriate and was working toward accomplishing it, those comments are relevant to the quantum meruit [sic] claim.").

[124] *Id.*

[125] *LCT Capital, LLC v. NGL Energy Partners LP,* 249 A.3d 77, 100-101 (Del. 2021). The Supreme Court posited that the jury may have intended to award Plaintiff with more than $4 million in *quantum meruit* damages and split its award between the two damages lines for *quantum*

testimony on the parties' fee negotiations and discussions, Plaintiff is precluded from submitting evidence or argument regarding an alleged agreement. Defendants' motion *in limine* to exclude evidence or argument on an alleged agreement is GRANTED.

## VI. Defendants' Motion *in Limine* to Preclude Evidence or Argument Regarding Alleged Fraud And-Or Fraudulent Statements Is GRANTED.

Plaintiff alleged fraudulent misrepresentation in Count III of its amended complaint.[126] On appeal, the Supreme Court struck the jury's fraud verdict and held that Plaintiff's fraud claim failed.[127] Evidence or argument of fraud is not probative of the reasonable fair market value of the services. Whether Defendants were dishonest toward Plaintiff during negotiations about compensation is distinct from the nature and quality of the services Plaintiff provided. There is no evidentiary basis to submit evidence of fraud, thus Defendants' motion to exclude this evidence is granted.[128] In an effort to provide the parties with concrete guidance and minimize

---

*meruit* and fraud. The Court reasoned that this was a possibility in light of the evidence the jury received suggesting Plaintiff provided "unusually valuable services" and then discussed the equity buy-in proposal and description of services in the October 2014 Letter. *Id.*

[126] Compl. ¶ 168-73. Plaintiff alleged Defendants fraudulently misrepresented that as a fee for Plaintiff's services, it would receive a 2% ownership interest in NGL Holdings with an option to purchase an additional 3% at a $700 million valuation, and with the taxes to be paid by Defendants. *Id.* This claim as well as Plaintiff's *quantum meruit* claim proceeded to trial and the jury awarded Plaintiff $29 million in damages for the fraud claim. *LCT Capital, LLC v. NGL Energy Partners LP*, Del. Super., C.A. No. N15C-08-109, Carpenter, J. (Aug. 1, 2018) (TRANSCRIPT OF VERDICT at 4).

[127] For a detailed discussion of the outcome of Plaintiff's fraud claim see *supra* Section II.B., n. 58-62 and accompanying text.

[128] The Court also finds that, considering the minimal probative value of this evidence, the risk of unfair prejudice substantially outweighs its probative value. D.R.E. 403. There is a significant likelihood that if the jury is presented with evidence suggesting that Defendants misled, falsely

38

any ambiguity that may result from this order, the Court is providing a list of terms and phrases that are excluded as fraud evidence. Plaintiff is not permitted to submit evidence or argument that includes the following terminology or any substantially similar word or phrase that a reasonable juror would equate with these terms:

Evidence or argument:

1.  Of "promises" or "representations" by Defendants
2.  That Defendants allowed or induced Plaintiff to believe a fee agreement had been reached
3.  Of false representations made by Defendants
4.  Of allegations that Defendants "strung Plaintiff along"
5.  Of a "verbal agreement" or "verbal contract"
6.  That Defendants "backed away from their commitment"
7.  That Defendants engaged in negligent conduct or were negligent in its communications with Plaintiff
8.  That Defendants concealed material facts from Plaintiff
9.  Of justifiable or reasonable reliance by Plaintiff resulting from Defendants' conduct or statements.

This list is not meant to be exhaustive. As the parties are in a greater command of the evidence they intend to present, the Court expects that they are in a better position to identify which evidence falls under the category of fraud.

represented or fraudulently induced Plaintiff into believing that a certain compensation arrangement would result, that it will inflame the jurors' emotions and cause them to select a damage amount predominantly on that basis instead of the value of Plaintiff's services. Plaintiff should not be awarded any damages on this basis because there is no longer a fraud claim.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Exclude Opinions and Testimony of Defendants' Rebuttal Expert, Lori A. Lancaster is DENIED; Defendants' *Daubert* Motion to Exclude the Opinions of Kevin D. McQuilkin is GRANTED, in part; Plaintiff's Motion *in Limine* to Hold NGL to Judicial Admissions and Exclude Evidence Suggesting the Value of LCT's Services Was Less Than $29 Million is DENIED; Plaintiff's Motion *in Limine* to Exclude Evidence of a "Typical" Investment Banker Fee as Irrelevant to Quantum Meruit Damages is DENIED; Defendants' Motion *in Limine* to Preclude Evidence or Argument Regarding Any Alleged Agreement Between the Parties is GRANTED; Defendants' Motion *in Limine* to Preclude Evidence or Argument Regarding Alleged Fraud and-or Fraudulent Statements is GRANTED; and Defendants' Motion *in Limine* to Preclude Evidence or Argument Regarding Value Creation is GRANTED.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**